## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 26 2015, 8:45 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Deidre L. Monroe
Lake County Public Defender's Office
Gary, Indiana

ATTORNEY FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of E.T., M.T., J.T., S.T., T.W., Minor Children, and their Mother, J.R.,

J.R.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

May 26, 2015

Court of Appeals Case No.
45A03-1410-JT-364

Appeal from the Lake Superior Court

The Honorable Thomas Stefaniak, Jr., Judge

Lower Court Cause Nos.
45D06-1403-JT-57
45D06-1403-JT-58
45D06-1403-JT-59
45D06-1403-JT-60
45D06-1403-JT-61

## Vaidik, Chief Judge.

# Case Summary

[1] J.R. ("Mother") appeals the termination of her parental rights to her five children. She argues that there is insufficient evidence to support the trial court's termination order and that termination of her parental rights is not in the children's best interests. But after nearly a decade of services designed to improve her parenting abilities, Mother has failed to prove that she is capable of maintaining a safe and appropriate home for her children. Meanwhile, the children are thriving in pre-adoptive foster homes. We therefore conclude that there is sufficient evidence to support the termination order and termination is in the children's best interests. We affirm.

# Facts and Procedural History

[2] Mother has five children at issue in this case: twins S.T. and J.T., born in August 2003; E.T., born in July 2005; M.T., born in December 2006; and T.W., born in June 2008.[1] Mother first became involved with the Indiana Department of Child Services (DCS) ten years ago, in 2005. At that time, S.T., J.T., and E.T. were adjudicated children in need of services (CHINS) due to, among other things, Mother's failure to provide medical care for S.T., who had an organ transplant and required routine treatment and medication; her history of drug use, particularly methamphetamine; and her violent relationship with

---

[1] Mother has had four other children: two are deceased, one was adopted, and the fourth does not live with Mother.

N.T., the father of the twins and E.T. The three children were removed from Mother's care and placed in foster care. Mother participated in services, and S.T. and J.T. were returned to her care in 2006. E.T., however, who has a genetic condition that requires specialized medical care, remained in foster care for two more years. E.T. was eventually returned to Mother's care, and the CHINS case was closed in 2009.

[3]     In March 2010 the children were adjudicated CHINS after DCS discovered that Mother's home was unsanitary and the twins were not attending school. The children had also been exposed to domestic violence between Mother and Q.W., T.W.'s father. The five children—M.T. and T.W. were born in the years following the first CHINS adjudication—were removed from Mother's care and placed in foster care. Mother participated in additional services, and in early 2012, the children were returned to her care. But later that year, DCS filed a third CHINS petition. It alleged that Mother was using drugs, her home was unsanitary, and she was still involved in a violent relationship with Q.W. Mother admitted the allegations, and the children were adjudicated CHINS and placed in foster care.[2] Mother was again ordered to participate in services, including supervised visitation, substance-abuse and domestic-violence assessments, and random drug screens.

---

[2] This was the third CHINS adjudication for the twins and E.T., and the second for M.T. and T.W. Likewise, this was the third removal for the twins and E.T., and the second for M.T. and T.W.

[4]     In September 2014 DCS filed a petition to terminate Mother's rights.  At a hearing on the petition, caseworkers expressed concern about Mother's extensive DCS history and the children's repeated removal from her care. Family Case Manager Tina Kozlowski ("FCM Kozlowski") testified that although Mother had completed the required services, she remained concerned about the idea of the children returning to Mother's care.  Tr. p. 40.  She noted Mother's violent, recurring relationship with Q.W., saying that she "fear[ed] . . . [Mother] and [Q.W.] would get back together and continue to create an unsafe environment for the children, as they have."  *Id.*  She also explained that S.T. and E.T. needed ongoing medical care, and she doubted that Mother would ensure that they received such care consistently.  *Id.* at 31.  Family Case Manager Tracy Pimental ("FCM Pimental") echoed these sentiments.  She also explained that the children acted out after being removed from Mother's care, but their behavior had improved in their current foster homes.  *Id.* at 95. Problematic behaviors returned, however, when Mother suggested that the children would be returning to live with her.  *Id.* at 117.  FCM Pimental testified that the children's behavioral issues—which included defiant and aggressive behavior, emotional outbursts, and hygiene problems—were caused by "the numerous removals" and "the things that they've witnessed in their home when they were back at home."  *Id.* at 109.  In FCM Pimental's opinion, the continuation of the parent-child relationship posed a threat to the children "due to the history . . . the inconsistency . . . with each removal it has progressed.  With each removal the standards of the home, the things that were going in the home had progressed, and we're at this point now."  *Id.* at 110.

She testified that termination was in the children's best interests because "th[e] [children] deserve and need stability and permanency in their lives. They've gone through enough." *Id.*

[5] Mother's drug use was also a cause for concern. Mother testified that she had been addicted to methamphetamine for ten years. *Id.* at 50. She also admitted that she tested positive for marijuana one time just before the termination hearing, but she claimed that someone brought marijuana-laced cookies to her workplace, and she ate the cookies without knowing they contained marijuana. *Id.* at 89-90.

[6] Raelene Reynolds, the children's therapist, testified that the children "had worked for almost two years to become stable," and had bonded with their foster parents. *Id.* at 132. Reynolds feared that "should [the children] be placed back with [Mother] . . . [there is] a high chance that they'll be removed again . . . . everything that they worked for I think would be lost." *Id.* According to Reynolds, the children's "best chance [is] to be adopted right now." *Id.* at 133.

[7] Family Case Manager Michael Wey ("FCM Wey") stated that in the past ten years, DCS had provided Mother with services worth $478,000, including:

> [c]linical interviews and assessments for all the parents and the children; domestic[-]violence assessment for the parents; domestic[-]violence services for the parents; substance[-]use disorder assessment for the parents; random drug testing for the parents; psychological evaluation for the parents and the children; bonding assessments for the parents and the children; individual counseling for the parents and children; family counseling for parents and children; home-based therapy for parents and children; homemaker services for parents for

transportation as needed; family[-]preservation services for parents and children; visitation[-]supervision services for parents and children; [] medication evaluation for the children; and ongoing medication monitoring for [J.T.], [S.T.], and [E.T.]. In addition . . . [Mother] . . . was offered parenting classes.

*Id.* at 143.

[8]    He testified that DCS's efforts were unsuccessful and Mother had not changed her ways. *Id.* at 143-44. He acknowledged that Mother loved the children, but stated that

> [t]here remains a concern of her ability to protect the children from abuse and neglect long term. She has been compliant with her services, but again there's participating and completing those services and [then] there's applying everything that [has] been learned from those services, and there is concern that the application of those skills learned in services would not be done.

*Id.* at 144. FCM Wey recommended terminating Mother's rights based on Mother's "inability to keep the children in a safe, [] stable, and permanent environment . . . as evidenced by the history in the previous cases." *Id.* at 146.

[9]    In September 2014 the trial court entered an order with findings terminating Mother's parental rights. Appellant's App. p. 1-8. In its detailed order, the court emphasized Mother's lengthy history with DCS:

> [DCS] has been involved with these children except for a few short months, since 2005 . . . . [T]he conditions that caused the first removal in 2005 continue to be an issue, due to [DCS] becoming involved a few short months after the first [CHINS] dismissal and then a few short months after the second [CHINS] dismissal for exactly the same reasons. The extensive and numerous services offered to the parents over the years have not remedied the situation. Mother testified that

[Q.W.] was out of her life and she is drug free. Those facts are positive for Mother and commendable.

It is unlikely that any of the parents can keep the children safe and healthy. Without the continuous intervention of [DCS], the reasons that cause[d] the numerous removals seem to re-appear. All services have proved to be ineffective due to the continued substance-abuse issues, the domestic-violence issues, the lack of medical care for the children, and the unsanitary home conditions. History has shown that none of these parents have been able to consistently meet the needs of the children and Mother's positive lifestyle choices of late are good steps. However, she is still in therapy and [that] will be ongoing. The children think that going to foster homes is a normal part of life, because that is all they have known. The children are currently in loving pre-adoptive homes and the children's past bad behaviors resurface when the children think they will return home with Mother.

The parents were given numerous chances over the years, and although money is not a determinative factor for the Court, the State of Indiana has spent over $450,000 on this family. That shows the great lengths that the State has gone to in trying to reunify these children. These children have been wards [of the State] for the better part of nine years. The parents have not remedied the problems after nine years of intervention. Domestic violence was frequent in the home, the home was filthy, [] the children were not receiving the full medical care that they needed, and drug use seems to continue with the mother. The children had been removed three times. The parents knew exactly what they needed to do to regain custody of these children and they were successful on occasion only to fall back into the same behavioral patterns. Mother loves her children, but under these facts that is not enough. The children have suffered enough trauma.

*Id.* at 3-4.

[10] Mother now appeals.

# Discussion and Decision

[11] Mother argues that there is insufficient evidence to support the trial court's order terminating her parental rights. She also argues that termination of her parental rights is not in the children's best interests.

[12] "The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citations omitted). The parent-child relationship is one of our culture's most valued relationships. *Id.* (citation omitted). "And a parent's interest in the upbringing of their child is 'perhaps the oldest of the fundamental liberty interests recognized by the courts.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). But parental rights are not absolute—"children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *Id.* (citations omitted). Thus, a parent's interests must be subordinated to a child's interests when considering a termination petition. *Id.* (citation omitted). A parent's rights may be terminated if the parent is unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs. *Id.* (citations omitted).

[13] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 1229 (citation omitted). Instead, we consider only the evidence and reasonable inferences that support the judgment. *Id.* (citation omitted). "Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous." *Id.* (citing Ind. Trial Rule 52(A)). In

determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* (citation omitted).

[14] A petition to terminate parental rights must allege:

(A) that one (1) of the following is true:

    (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

    (ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

    (iii)    The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[15]    "DCS must prove the alleged circumstances by clear and convincing evidence." *K.T.K.*, 989 N.E.2d at 1231 (citation omitted). On appeal, Mother challenges the sufficiency of the evidence supporting the trial court's judgment as to subsections (B) and (C) of the termination statute.

# 1. Conditions Remedied

[16]    Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS was required to establish, by clear and convincing evidence, only one of the three requirements of subsection (B). We therefore only discuss whether there is a reasonable probability that the conditions that resulted in the children's removal or the reasons for their placement outside Mother's home will not be remedied.

[17]    In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step

analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* (quotation omitted). The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing any recent improvements against "habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* (citations omitted). In so doing, trial courts have discretion to "weigh a parent's prior history more heavily than efforts made only shortly before termination," and courts may find "that parents' past behavior is the best predictor of their future behavior." *Id.*

[18] Here, the trial court concluded that there was a reasonable probability that the conditions resulting in the children's removal from Mother's care or placement outside her home would not be remedied. The court was primarily concerned with Mother's lengthy DCS history and the children's repeated removals. As the court explained:

> The parents were given numerous chances over the years, and although money is not a determinative factor for the Court, the State of Indiana has spent over $450,000 on this family. That shows the great lengths that the State has gone to in trying to reunify these children. These children have been wards [of the State] for the better part of nine years. The parents have not remedied the problems after nine years of intervention. Domestic violence was frequent in the home, the home was filthy, [] the children were not receiving the full medical care that they needed, and drug use seems to continue with

the mother. The children had been removed three times. The parents knew exactly what they needed to do to regain custody of these children and they were successful on occasion only to fall back into the same behavioral patterns.

Appellant's App. p. 3-4.

[19] The evidence provided at the termination hearing supports the court's findings. Three caseworkers testified that after repeated CHINS adjudications and nearly a decade of services, they still doubted Mother's ability to parent the children long term, particularly in light of her past drug use and violent relationship with the father of her youngest child. When asked about drug use, Mother admitted that she tested positive for marijuana just before the termination hearing, but she claimed she ingested the marijuana unwittingly. FCM Pimental and FCM Wey testified that continuing the parent-child relationship posed a threat to the children, and FCM Wey recommended terminating Mother's rights. He explained that although Mother had complied with her case plan and participated in services, "there's participating and completing those services and [then] there's applying everything that [has] been learned from those services, and there is concern that the application of those skills learned in services would not be done." Tr. p. 144. Having heard this and other evidence, the trial court was within its discretion in determining that Mother's historical inability to parent the children appropriately would not change, even though she made some progress during the most recent CHINS proceeding. *See E.M.*, 4 N.E.3d at 643 (trial courts have discretion to "weigh a parent's prior history more heavily than efforts made only shortly before termination," and courts may find "that parents' past behavior is the best predictor of their future behavior."); *see*

*also In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009) (DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change.). We conclude that the trial court properly determined that there was a reasonable probability that the conditions resulting in the children's removal or the reasons for their placement outside Mother's home would not be remedied.

## 2. Best Interests

[20] Mother also contends that termination of her parental rights is not in the children's best interests. In determining what is in a child's best interests, the trial court must look to the totality of the evidence. *See A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied.* "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.*

[21] Mother has been working with DCS for nearly a decade. During this time, the children were repeatedly removed from her care, sometimes for years at a time. As caseworkers explained at the termination hearing, this had a negative impact on the children, who acted out upon each removal. But in the years leading up to the termination hearing, the children's behavior improved and they bonded with their foster parents, who wished to adopt them. FCM Pimental testified that termination was in the children's best interests because "th[e] [children] deserve and need stability and permanency in their lives. They've gone through

enough." Tr. p. 110. Reynolds, the children's therapist, testified that the children "had worked for almost two years to become stable," and had learned to trust their foster parents. *Id.* at 132. Reynolds feared that "should [the children] be placed back with [Mother] . . . [there is] a high chance that they'll be removed again . . . everything that they worked for I think would be lost." *Id.* According to Reynolds, the children's "best chance [is] to be adopted right now." *Id.* at 133.

[22] We conclude that the evidence supports the trial court's determination that termination of Mother's parental rights is in the children's best interests. *See In re A.I.*, 825 N.E.2d 798 (Ind. Ct. App. 2005) (testimony of caseworkers, together with evidence that the conditions resulting in placement outside the home will not be remedied, was sufficient to prove by clear and convincing evidence that termination was in child's best interests), *trans. denied*; *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them).

Affirmed.

Kirsch, J., and Bradford, J., concur.